# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ADAM FRANCHI and DAVID PILL, on behalf of themselves and those similarly situated,

Plaintiffs,

v.

JAFFREY A. FIRESTONE, KEVIN LEWIS, PETER K. SHEA, SACHIN LATAWA, CARL C. ICAHN, HIGH RIVER LIMITED PARTNERSHIP, KOALA HOLDING LP, STARFIRE HOLDING CORPORATION, and VOLTARI MERGER SUB LLC,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0503-KSJM

## ORDER GRANTING MOTIONS TO DISMISS

1.      This action challenges a going-private transaction through which Carl C. Icahn and affiliated entities owning approximately 53% of the voting stock of Voltari Corporation ("Voltari" or the "Company") acquired the minority stockholders' interests (the "Merger").  To invoke business judgment rule protection under *Kahn v. M & F Worldwide Corp.* ("*MFW*"),[1] Icahn conditioned his initial offer on approval by a special committee and an informed vote by a majority of the minority stockholders.  The special committee was empowered to enlist its own advisors and definitively say no, and the minority stockholders were uncoerced.

---

[1] 88 A.3d 635 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

2. The plaintiffs, former Voltari stockholders, allege that Icahn acquired the Company to take advantage of over $78.7 million in net operating loss carryforwards ("NOLs") that were of no or limited value to the Company or third parties. They contend that the Merger consideration of $0.86 per share, which generates an implied deal price of $7.7 million, undervalued the Company's NOL assets. They claim that Voltari's board of directors (the "Board"), Icahn, and affiliated entities breached their fiduciary duties to the minority stockholders by approving the Merger. The defendants have moved to dismiss the complaint. Their primary argument is that the transaction is subject to business judgment review under *MFW*. This Order grants the motions.

## I. FACTUAL BACKGROUND

3. The facts are taken from the Verified Complaint (the "Complaint"), the documents it incorporates by reference, and certain judicially noticeable public documents, including filings with the Securities and Exchange Commission (the "SEC").[2]

4. Voltari was a Delaware corporation headquartered in New York. Prior to the Merger, Voltari acquired, financed, and leased commercial real estate properties. At the time of the Merger, the Company's assets comprised its NOLs, which were worth

---

[2] By agreement of the parties, documents incorporated by reference into the Complaint include those produced to the plaintiffs pursuant to Section 220 of the Delaware General Corporation Law. Some of those documents were provided to the court through the Transmittal Declaration of Douglas D. Herrmann in Support of Defendants Jaffrey A. Firestone, Kevin Lewis, and Peter K. Shea's Motion to Dismiss the Verified Class Action Complaint ("Herrmann Decl."). Dkts. 9, 11–12.

anywhere from $0 to $78.7 million, and three commercial real estate investments, which were collectively worth approximately $23 to $24 million.

5. Icahn owned approximately 52.69% of the Company's outstanding common shares through his affiliated entities, Defendants High River Limited Partnership ("High River") and Koala Holding LP ("Koala").

6. On December 7, 2018, High River offered to buy the outstanding shares of the Company's common stock for $0.58 per share in cash. An entity 99.4% owned by Icahn, Defendant Starfire Holding Corp. ("Starfire"), would be the acquirer.

7. High River's offer letter stated "that consummation of the proposed transaction would, in addition to customary conditions, be subject to the non-waivable conditions that the proposed transaction be approved by (i) a special committee of independent directors of the Company that has been empowered to freely select its own advisors and to reject the transaction definitively should that be its business judgement, and (ii) an informed vote of, or tender by, the holders of a majority of the unaffiliated shares."[3]

8. The Board at the time comprised Defendants Jaffrey A. Firestone, Kevin Lewis, Peter Shea, and Sachin Latawa (collectively, the "Director Defendants"). The Board determined that Latawa's "recent employment by Icahn Enterprises L.P. made him unsuitable to serve on the Special Committee."[4] So, in response to High River's letter, on

_____

[3] Herrmann Decl. Ex. 1 ("Proxy") at 20.
[4] Herrmann Decl. Ex. 3 at VOLT_00002.

3

December 10, 2018, the Board formed a special committee comprising Firestone, Lewis, and Shea (the "Special Committee").

9. The Special Committee engaged Dorsey & Whitney LLP ("Dorsey & Whitney") as its legal counsel and Alvarez & Marsal Valuation Services, LLC ("Alvarez & Marsal") as its financial advisor.

10. Dorsey & Whitney and Alvarez & Marsal met with High River on February 4, 2019, "to discuss certain aspects of the Company's net operating loss carryforwards, research and development, . . . tax credits and foreign tax credits."[5]

11. The Special Committee met on February 6, 2019, with representatives of Dorsey & Whitney and Alvarez & Marsal in attendance. Alvarez & Marsal advised that a buyout of the Company by Icahn would have "an illustrative *incremental* value of $6.97 to $8.57 per share," but only to Icahn.[6] According to the minutes of that meeting:

> Alvarez & Marsal determined that the value of the tax benefits associated with the Company's net operating loss (***"NOL"***) carryforwards, R&D tax credits and foreign tax credits (the ***"Tax Benefits"***) based on the Company's standalone expected taxable income would be $0 (the ***"Standalone Scenario"***). In addition, Alvarez & Marsal separately evaluated the value of the Tax Benefits, solely for illustrative purposes, under two different scenarios: (i) a controlling shareholder acquires the Company (the ***"Related-Party Transaction Scenario"***); and (ii) a third-party acquires the Company (the ***"Third-Party Transaction Scenario"***).
>
> Alvarez and Marsal's analyses indicated (i) an implied common equity value reference range per share of the Company's common stock of $0 under the Standalone

---

[5] Proxy at 21.

[6] *See* Herrmann Decl. Ex. 6 at VOLT_00013.

Scenario; (ii) an illustrative *incremental* value of $6.97 to $8.57 per share associated with the Tax Benefits to High River and its affiliates under the Related-Party Transaction Scenario; and (iii) an illustrative *incremental* value of $0.02 per share to a third-party acquiror under the Third-Party Transaction Scenario.[7]

12. Based on Alvarez & Marsal's analysis, "the Special Committee determined that running a process to seek an alternate buyer would not be a good use of company resources and would not be in the best interests of the Company and its shareholders."[8]

13. The Special Committee met again on February 14, 2019, and decided to counter Icahn's offer with $0.97 per share. This kicked off price negotiations. High River increased its offer to $0.68 per share on February 19. The Special Committee countered with $0.90 per share on February 21. High River increased its offer to $0.80 per share on February 25. The Special Committee countered at $0.88 per share on February 28. High River responded with an offer of $0.86 per share on March 5.

14. On March 22, 2019, the Special Committee and then the Board met and unanimously approved the $0.86 per share price. At the Special Committee meeting, Alvarez & Marsal presented its analysis confirming the "illustrative implied value of the Tax Benefits to High River and its affiliates of $78.7 million."[9]

15. The parties executed the Merger Agreement on March 22 and announced the transaction on March 25, 2019.

---

[7] *Id.*

[8] *Id.*

[9] Herrmann Decl. Ex. 7 at VOLT_00030.

16.     On July 10, 2019, Voltari filed a proxy describing the terms of the proposed Merger (the "Proxy"). The Proxy stated that the stockholder vote on the Merger would take place on August 20, 2019. On August 20, 2019, however, Voltari announced that the stockholder meeting would be adjourned to September 12, 2019, because there were insufficient minority votes cast in favor of the Merger to comply with the majority-of-the-minority provision. Again, on September 12, 2019, Voltari announced that the stockholder meeting would be adjourned, this time to September 24, 2019, because there were insufficient minority votes cast in favor of the Merger to comply with the majority-of-the-minority provision.

17.     The stockholder meeting took place on September 24, 2019, and the Merger was approved with slightly more than 50% of the minority vote. The Merger closed that same day.

18.     On June 14, 2019 and August 7, 2019, respectively, Adam Franchi and David Pill (together, "Plaintiffs") served demands on the Board pursuant to *8 Del. C.* § 220. Each later filed enforcement actions pursuant to 8 *Del. C.* § 220 (the "220 Actions").[10] Plaintiffs voluntarily dismissed the 220 Actions in March 2020 after the Company produced books and records.

19.     Plaintiffs filed their complaint on June 23, 2020, asserting three counts. In Count I, Plaintiffs claim that the Director Defendants breached their fiduciary duties by

---

[10] *See In re Voltari Corp. Section 220 Litig.*, Cons. C.A. No. 2019-0559-MTZ (Del. Ch. 2019).

approving the merger. In Count II, Plaintiffs claim that High River, Koala, Starfire, and Voltari Merger Sub LLC (collectively, the "Entity Defendants," and with the Director Defendants and Icahn, "Defendants") and Icahn comprise a control group and that they breached their fiduciary duties in connection with the Merger. In Count III, Plaintiffs claim that the Entity Defendants and Icahn were unjustly enrichments by the Merger.

20. Defendants moved to dismiss all claims pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim.[11] The motion was fully briefed on October 19, 2020, and the court held oral argument on February 15, 2021.[12]

## II.   LEGAL ANALYSIS

21. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[13] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint

---

[11] Dkt. 9, Defs. Jaffrey A. Firestone, Kevin Lewis, and Peter K. Shea's Mot. to Dismiss the Verified Class Action Compl.; Dkt. 12, Mot. to Dismiss of Defs. Sachin Latawa, Carl C. Icahn, High River Limited Partnership, Koala Holding LP, Starfire Holding Corporation and Voltari Merger Sub LLC.

[12] *See* Dkt. 9, Opening Br. in Supp. of Defs. Jaffrey A. Firestone, Kevin Lewis, and Peter K. Shea's Mot. to Dismiss the Verified Class Action Compl.; Dkt. 12, Opening Br. of Defs.' Sachin Latawa, Carl C. Icahn, High River Limited Partnership, Koala Holding LP, Starfire Holding Corporation and Voltari Merger Sub LLC in Supp. of Their Mot. to Dismiss; Dkt. 18, Pls.' Answering Br. in Opp'n to Defs.' Mots. To Dismiss the Verified Class Action Compl. for Breach of Fiduciary Duty ("Pls.' Answering Br."); Dkt. 24, Reply Br. in Supp. of Defs. Jaffrey A. Firestone, Kevin Lewis, and Peter K. Shea's Mot. to Dismiss the Verified Class Action Compl.; Dkt. 25, Reply Br. of Defs. Sachin Latawa, Carl C. Icahn, High River Limited Partnership, Koala Holding LP, Starfire Holding Corporation, and Voltari Merger Sub LLC; Dkt. 40, Feb. 15, 2021 Tr. of the Oral Arg. on Defs.' Mots. to Dismiss Held via Zoom ("Oral Arg. Tr.").

[13] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

7

as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[14] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[15]

22.    Defendants argue that dismissal is appropriate under Rule 12(b)(6) because the business judgment standard applies under *MFW* and the Complaint fails to state a claim under that standard.

23.    Under *MFW*, a claim is subject to the business judgment standard of review if six prerequisites designed to protect the rights of the minority are present. Those prerequisites are:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders;
>
> (ii) the Special Committee is independent;
>
> (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively;
>
> (iv) the Special Committee meets its duty of care in negotiating a fair price;
>
> (v) the vote of the minority is informed; and

---

[14] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[15] *Price v. E.I. Du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

(vi) there is no coercion of the minority.[16]

24. Plaintiffs challenge three of those factors, contending that (1) the Special Committee lacked independence, (2) the Special Committee failed to exercise its duty of care, and (3) the vote of the minority was not informed.

25. "To plead that a director is not independent 'in a manner sufficient to challenge the *MFW* framework, a plaintiff must allege facts supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party so as to undermine the director's ability to judge the matter on its merits.'"[17] "If the complaint supports a reasonable inference that [any] member [of the special committee] was not disinterested and independent, then the plaintiffs have called into question this aspect of the *MFW* requirements."[18]

    a. During oral argument, Plaintiffs' counsel conceded that the allegations are inadequate to cast doubt on the independence of Firestone or Lewis.[19] As to Firestone, Plaintiffs allege that he previously founded a company

---

[16] *MFW*, 88 A.3d at 645 (formatting altered).

[17] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *35 (Del. Ch. June 11, 2020) (alteration omitted) (quoting *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *9 (Del. Ch. Oct. 10, 2016)); *see also Solomon v. Armstrong*, 747 A.2d 1098, 1118 (Del. Ch. 1999) ("[I]t is well established that when a party challenges a director's action based on a claim of the director's debilitating pecuniary self-interest, that party must allege that the director's interest is material to that director."), *aff'd*, 746 A.2d 277 (Del. 2000).

[18] *Dell,* 2020 WL 3096748, at *35 (collecting authorities).

[19] Oral Arg. Tr. at 42 (Plaintiffs' Counsel) ("You know, [Firestone and Lewis] -- either of them standing alone -- I'm not going to, like, tell you that the law would find that they, by

9

that collaborated with an Icahn-controlled entity (once, twenty-years ago), he was nominated to two boards by Icahn over the past decade, and he is assisting with a documentary about Icahn. As to Lewis, Plaintiffs allege that he served as a Senior Vice President and then Chief Marketing Officer of an Icahn-controlled entity from 2009 through 2012. Of these allegations, all but those concerning Firestone's involvement in the Icahn documentary concern the sort of ordinary past business relationships, board nominations, and board service that this court has deemed insufficient to cast doubt on a director's independence.[20] Although the allegation concerning Firestone's involvement with the documentary is more unusual, Plaintiffs fail to explain how it moves the needle in their favor and ultimately conceded that it does not.

    b.    As to Shea, Plaintiffs allege that he served as President of Icahn Enterprises from 2006 to 2009. During that time, he served as head of portfolio

---

themselves, lack independence from Mr. Icahn. You know, I don't want to say something that doesn't make sense.").

[20] *See MFW*, 88 A.3d at 649 ("Bare allegations that directors are friendly with . . . or have past business relationships with the proponent of a transaction . . . are not enough to rebut the presumption of independence."); *Edgewater Growth Cap. P'rs LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 230 (Del. Ch. 2013) ("Our Supreme Court has long recognized that the manner in which someone is nominated to the board is not evidence of their lack of independence."); *see also In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."), *aff'd*, 125 A.3d 304 (Del. 2015); *In re Rouse Props., Inc. Fiduciary Litig.*, 2018 WL 1226015, at *15 (Del. Ch. Mar. 9, 2018) ("Our case law is clear . . . that the appointment of a director onto the board, even by the controlling stockholder, is insufficient to call into question the independence of that director.").

operations for Icahn Associates, which included an activist hedge fund and thirteen operating companies owned or controlled by Icahn. He also served as a director on the boards of the following Icahn-controlled entities: American Railcar Industries, Inc., WestPoint International, Inc., XO Holdings, Inc., and PSC Metals, Inc. After he left his position with Icahn Enterprises, he served on the boards of three other Icahn-controlled companies: Trump Entertainment Resorts, Inc., Viskase Companies, Inc. ("Viskase") and CVR Partners LP ("CVR"). Shea was still on the boards of Viskase and CVR at the time of the Merger, but that is insufficient to cast doubt on Shea's independence from Icahn.[21] The more extensive past business relationships between Shea and Icahn present a closer call than those of Firestone and Lewis. Of the past relationships, however, the vast majority ended at least ten years before the Merger, making it unreasonable to infer that they impugned Shea's independence from Icahn at the time of the Merger.[22]

---

[21] *See supra* note 20. In addition to the above allegations, the Complaint alleges that, at the time of the transaction, Shea was actively employed by two Icahn entities. At oral argument, however, Defendants' counsel stated that these allegations were inaccurate, and after oral argument, Plaintiffs' counsel submitted a letter to the court confirming that Shea was not employed by Icahn at the time of the Merger. *See* Dkt. 36, Letter to the Honorable Kathaleen S.J. McCormick from P. Bradford deLeeuw.

[22] *See, e.g., Yucaipa Am. All. Fund II, L.P. v. Riggio*, 1 A.3d 310, 315 (Del. Ch. 2010) (rejecting independence challenge where director worked as controlling stockholder's subordinate over ten years before challenged transaction), *aff'd*, 15 A.3d 218 (Del. 2011); *id.* at 315 & n.21 (acknowledging that the New York Stock Exchange has a "cooling-off period" rule, which states that a director becomes "independent" three years after ceasing to serve as a director); *In re MFW S'holders Litig.*, 67 A.3d 496, 514 (Del. Ch. 2013) (rejecting claim that business dealings nine years earlier supported finding of lack of independence), *aff'd sub nom.*, 88 A.3d 635; *Teamsters Union 25 Health Servs. & Ins.*

26. To demonstrate that the cleansing effect of *MFW* does not apply because the Special Committee failed to exercise its duty of care, Plaintiffs must plead that the Special Committee acted with gross negligence.[23] "Gross negligence involves more than simple carelessness. To plead gross negligence, a plaintiff must allege 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'"[24] Disagreeing with a special committee's strategy is not a duty of care violation.[25] Nor is "questioning the sufficiency of the price."[26]

      a.     Plaintiffs allege that the Special Committee fell victim to a "controlled mindset" that resulted in a "windfall" to Icahn in the form of tax savings from Voltari's NOLs.[27] Plaintiffs contend that the Special Committee neglected to ask its financial advisor to explore alternative transactions, failed to use the information it received from its advisors effectively to negotiate a higher price, and "operated as

---

*Plan v. Baiera*, 119 A.3d 44, 60–61 (Del. Ch. 2015) (rejecting challenge to director's independence based on former board service ending three years prior).

[23] *See Flood*, 195 A.3d at 767–68.

[24] *E.g., Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019) (quoting *Zucker v. Hassell*, 2016 WL 7011351, at *7 (Del. Ch. Nov. 30, 2016)).

[25] *See Flood*, 195 A.3d at 768 ("Disagreeing with the special committee's strategy is not a duty of care violation." (cleaned up)); *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("Directors' decisions must be reasonable, not perfect. In the transactional context, an extreme set of facts is required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." (cleaned up)).

[26] *Flood*, 195 A.3d at 768.

[27] Pls.' Answering Br. at 24–31.

if it were a foregone conclusion that the minority stockholders would receive only a tiny fraction of the value of the NOLs to the Company's acquirer."[28]

      b.     Yet, the Special Committee met seven times, engaged and consulted with independent advisors, came to a reasoned decision to negotiate a transaction with Icahn, and successfully bid the deal price up by 48% percent. In the face of these facts, it is not reasonably conceivable that the Special Committee acted with a controlled mindset. Plaintiffs' contentions concerning a "windfall" to Icahn amount to mere questioning of the deal price, which is not enough to establish gross negligence.

27.     To demonstrate that the cleansing effect of *MFW* does not apply due to disclosure violations, Plaintiffs must show that the Proxy failed to disclose material facts.[29] The materiality standard requires that fiduciaries disclose all facts which, "under all the circumstances[,] . . . would have assumed actual significance in the deliberations of the reasonable shareholder."[30] "A material fact is one that a reasonable investor would view as significantly altering the 'total mix' of information made available."[31]

      a.     Plaintiffs allege that "[t]he Proxy failed to disclose material information regarding the Special Committee members' conflicts of interest."[32]

---

[28] *Id.* at 26–27.

[29] *See Olenik v. Lodzinski*, 208 A.3d 704, 719 (Del. 2019).

[30] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *13 (Del. Ch. Jan. 3, 2013) (ellipses in original).

[31] *Zaucha v. Brody*, 1997 WL 305841, at *5 (Del. Ch. June 3, 1997).

[32] Compl. ¶ 51.

Because Plaintiffs failed to adequately allege that any member of the Special Committee was conflicted, disclosures related to the supposed conflicts are immaterial.[33]

   b.   Plaintiffs also allege that the Proxy "failed to disclose that the Board determined that Latawa's recent employment by Icahn Enterprises L.P. made him unsuitable to serve on the Special Committee."[34] Because Latawa was excluded from the Special Committee, however, it is hard to understand how this omission would have assumed actual significance in the deliberations of the reasonable stockholder. Defendants made this point, and Plaintiffs failed to address it in briefing or during oral argument. This alleged omission does not render the vote of the minority stockholders uninformed.

28.   Because Plaintiffs have failed to allege facts sufficient to undermine the cleansing effect of the *MFW* conditions, the business judgment standard applies to the Merger. When the business judgment standard applies, "dismissal is typically the result."[35]

---

[33] *See Orman v. Cullman*, 794 A.2d 5, 33–34 (Del. Ch. 2002) (holding that failure to disclose "nonexistent interest or lack of independence" was not a material disclosure violation).

[34] Compl. ¶ 55 (internal quotation marks omitted).

[35] *Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016) (ORDER) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful."); *accord. In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *9 (Del. Ch. Nov. 20, 2018) ("If [the vote was fully informed and uncoerced], the Motion to Dismiss must be granted because the business judgment rule becomes the *de jure* standard of review and Plaintiff has not alleged waste."); *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 749–50 (Del. Ch. 2016) ("Because Volcano's fully

14

Plaintiffs offer no argument that the complaint states a claim under the business judgment standard and thus tacitly concede that it does not. Accordingly, Counts I and II are dismissed as to all defendants.

29.    Plaintiffs likewise concede that the unjust enrichment claim fails to state a claim if the business judgment rule applies under *MFW*.[36] Accordingly, Count III is dismissed as to the Count III defendants.

## III.    CONCLUSION

30.    For the foregoing reasons, the motions of the Director Defendants, Entity Defendants, and Icahn pursuant to Rule 12(b)(6) are GRANTED.[37]

*/s/ Kathaleen St. J. McCormick*
Chancellor Kathaleen St. J. McCormick
Dated:  May 10, 2020

---

informed, uncoerced, disinterested stockholders approved the Merger by tendering a majority of the Company's outstanding shares into the Tender Offer, the business judgment rule irrebuttably applies. The Merger, therefore, only can be challenged on the basis that it constituted waste.").

[36] Oral Arg. Tr. at 47–48 (Plaintiffs' Counsel) ("I understand that unjust enrichment can't be a substitute for *MFW*. . . . I don't think that argument works. I think that if it's an *MFW* situation, you can't get through the back door by alleging unjust enrichment.").

[37] Icahn argues that the exercise of personal jurisdiction over him in connection with this action would violate due process and has moved to dismiss pursuant to Rule 12(b)(2). He also joins in the other defendants' Rule 12(b)(6) arguments. Because this Order grants the Rule 12(b)(6) arguments, it need not reach Icahn's Rule 12(b)(2) arguments.